W. E. PERRY, Plaintiff-in-Error, v. UNITED STATES FIDELITY & GUARANTY COMPANY, Defendant-in-Error.—359 S. W. (2d) 1.

Western Section, Jackson. February 21, 1962.

Certiorari Denied by Supreme Court June 5, 1962.

664

Molloy & Leary, Memphis, for plaintiff in error.

Charles G. Morgan, Memphis, for defendant in error.

AVERY, P. J. (W. D.) This case comes to this Court from the Circuit Court of Shelby County, Division III. It is a suit by W. E. Perry against the United States Fidelity & Guaranty Company, a Maryland Corporation, seeking to recover $7,550.00 and the interest thereon from July 6, 1959, representing the balance of a judgment in excess of the limits of his garage liability policy carried with the defendant. The maximum liability under the policy, damage to one defendant was $10,000 and it carried a limit of $20,000 for each overall accident for bodily injury, together with $5,000 property damage.

Benjamin Griffith, Jr. and Cleveland Mangham, Jr. sued the plaintiff, W. E. Perry, in the United States District Court at Memphis, Tennessee. The suit by Griffith was for personal injury and property damages and suit by Mangham was only for personal injury damage. There was a verdict and judgment in favor of Griffith for $19,000 and a verdict and judgment for Mangham for $5,000. Motions for new trial were seasonably filed in that Court and overruled. There was no appeal on the verdict and judgment of said Federal Court, and the United States Fidelity & Guaranty Company paid $10,000, the limit of its policy for one personal injury on the $19,000 judgment and the property damage of $1450.00, leaving a balance of that judgment of $7,550. Said insurance company also paid the $5,000 judgment in favor of Mangham. There is no controversy in the Mangham matter, and this suit is by Perry and relates alone to the Griffith judgment as stated hereinbefore.

Since this suit grows out of a former suit, when in this opinion we refer to W. E. Perry by his status in the lower court, "plaintiff", it will mean his status in this particular case, and wherever we refer to him by name it will be in connection with the suit against him in the United States District Court. The defendant in this case will be referred to by the designation "Insurance Company."

The plaintiff is or was the operator of a wrecker service at Millington, Tennessee. On or about December 13, 1958, a call was received by his employee to go out to Shelby Drive and pick up a Packard automobile which had been damaged. Plaintiff's employee proceeded to the point of the call with the wrecker, hooked the rear of

the Packard automobile to the rear of the wrecker with the hitch and lift hook, lifted the rear of the Packard from the ground, tied the steering wheel of the Packard with a nylon cord or rope to the panel of the door on the driver's side so as to hold the front end straight and the front wheels stable and was returning from the place where the Packard was picked up to the garage of the plaintiff where the safety chain was fastened from the wrecker to the Packard by young Perry, a son of plaintiff, and then proceeded south on Highway 51 to carry the damaged Packard to a Mr. Priest's garage, and at some place along said highway met Benjamin Griffith and Cleveland Mangham in a small Volkswagen and driving in an opposite direction from that of the plaintiff's wrecker, the Volkswagen collided with the Packard automobile and both the young men in the Volkswagen were injured, said collision was the foundation for the suit in the Federal Court.

In the instant case after the conclusion of all the proof, Honorable Andrew O. Holmes, Judge of Division III of the Circuit Court of Shelby County, Tennessee, sustained a general motion of defendant for directed verdict in its favor, holding that there was no evidence supporting the issue or allegations of bad faith on the part of the defendant and no disregard for the obligation to plaintiff on the part of counsel and agents for the insurance company, who in that case represented Perry under its contractual obligation.

The declaration alleges that soon after the accident occurred it was reported to the insurance company and that the insurance company undertook the investigation and the handling of the matter.

The declaration alleges that plaintiff carried a Garage Liability Policy with maximum liability to one person of $10,000; in one accident to all persons of $20,000, and $5,000 property damage issued by defendant, and that the driver of the wrecker, "Luther Strevel" (perhaps meaning Wesley), also carries an automobile liability policy issued by defendant with $25,000 as to one personal injury and $50,000 for all in one accident, on his personal automobile, a "Willy 2-door station wagon".

The declaration sets out in Count I statements of acts which it refers to as negligence on part of insurance company but in short, in order to state them as fully as should be, the declaration alleges negligence in investigation of the facts of the case and preparing for trial. That readily available evidence in Perry's behalf they did not secure or possess. It alleges certain negligence on the part of the adjuster in directing the said Perry to answer questions in the case in the Federal Court. That in a traffic hearing against Benjamin Griffith in the General Sessions Court of Shelby County Insurance Company furnished no counsel at that hearing. That failure of company to advise the plaintiff that the policy of the driver of the wrecker would not cover any judgment that might be obtained for the injured was negligence. It alleges defendant negligently failed to keep plaintiff advised of negotiations that were carried on by the company and the investigator. It also alleges negligence on the part of attorneys in the trial of the case in the Federal Court for failure to advise plaintiff in this case that counsel for Griffith and Mangham had offered a settlement in the case, which counsel for Perry refused.

The usual recitations in the declaration to the effect that the provisions of the garage liability policy covered the injuries to body and property damage of Griffith.

The second count simply alleges that the acts of negligence set forth in the first count amounted to bad faith on the part of the insurance company.

In the third count it is alleged bad faith and negligence on the part of the investigators and adjusters in that it is averred that the handling of the matter fell below the standard of insurance adjusters in this area, and alleges that the investigation was not thorough as required by insurance companies of such matters.

There was a motion made by the defendant to require the plaintiff to make the declaration more specific, and that was done by setting out more specific averments but they amount to about what has been said above.

There is also a motion made by the plaintiff to require defendant to plead more specifically after defendant had filed its simple not guilty plea.

In the special pleas filed insurance company admitted that it had a garage liability policy issued to the said Perry, and then specifically pleads that in the trial of the case in the Federal Court it was the contention of the plaintiff in that case that when the wrecker which was carrying the Packard automobile met the Volkswagen being driven by Griffith in which Mangham was a passenger or guest, that this automobile driven by Griffith, after it had met and gotten by the wrecker, crossed the center line of the highway on to the traffic lane occupied by the towed Packard automobile and struck the automobile in the right side. That the case

was tried on that theory and that there was no negligence on the part of the operators of the wrecker.

It is admitted in the special plea that this defense was rejected by the jury, which returned its verdict as before stated. This special plea then denies that there was negligence in the investigation of the accident, denies that a workmanlike job was not done in the investigation of the accident in that the evidence accessible was not procured nor was evidence that was procured preserved. It denies that it was negligent in failing to send counsel or investigator to the traffic court when Griffith was tried there, and avers that no charges were placed against the plaintiff in this case or his employees as result of the accident in which Griffith was injured. It then states that an adjuster for the defendant was present at that General Sessions hearing and had a court reporter present in the General Sessions Court; had the testimony taken; paid for the transcription, and that this was used during the trial in the Federal Court. All specific negligence set forth in the declaration is denied item by item. It is specifically denied that it failed to keep plaintiff advised of negotiations and failed to advise plaintiff that Griffith's attorney had offered to settle the case for $6,000.

The plea admits that it owed the plaintiff the duty to conduct a reasonable and diligent investigation and to represent him in the hearing, if he so desired. It further avers that a complete and full investigation was made; that the plaintiff in this case was kept advised of the negotiations of the entire matter; that it advised the plaintiff in this case, who was defendant in the Federal Court that the suit there had been brought for

considerably more than the liability that the company might have and notified him to obtain counsel to represent him personally other than the ones who were representing the insurance company, if he so desired.

It further averred that the plaintiff in this case, who was defendant in the Federal Court case did advise with a different attorney, who is shown by the record to be attorney in this case, and that the attorney thought it was unnecessary for Perry to employ some other one to represent him. It is further averred that when the case was called for trial in the Federal Court that Perry's attorney was invited to be present and assist the attorneys that represented the defendant in that case, and he declined to be present or participate in the trial, was not present during the trial of the case although he was advised of the progress of the trial.

Motion for new trial was seasonably made in the Court below, overruled, exceptions were saved, appeal was prayed, granted and perfected to this Court where errors have been assigned as follows:

The assignments of error are two in number, are very short and are as follows:

"1.

"The Court erred in sustaining the defendant's motion for directed verdict at the close of all the evidence.

"2.

"The Court erred in granting the defendant's motion for directed verdict on the basis that plaintiff is required to show bad faith rather than negligence on the part of the defendant."

· ·When the case was heard in this Court attorney for the defendant insists that the assignments of error do not comply with the rules of the Court, and therefore, should be stricken, or at least should not be considered.

These assignments standing alone as they are found on page 5 of the assignments of error and brief of the plaintiff do not comply with requirements of this Court. Sub-section (1) of Rule 11 provides as follows:

"The assignment of errors shall contain in the order herein stated:

"(1) A statement of the nature and purpose of the case, and the precise points raised by the pleadings, with such reference thereto as may be necessary, the substance of the verdict and judgment thereon, or judgment without verdict, or decree, with reference to pages of the transcript whereon each appears.

"(2) A statement of the errors of fact or law relied upon to reverse or modify the same, showing specifically wherein the action complained of is erroneous, and how it prejudiced the rights of the appellant, or plaintiff in error, with references to the pages of the record where the ruling of the court on matters constituting errors of law appeared; and, in case it is an error of fact, to the pages of the record where the testimony relied upon to sustain the same is to be found."

The most glaring failure to comply with the said rule of this Court as appears in the assignments of error filed is the fact that nowhere in it is it pointed out "the precise points raised by the pleadings, with such ref-

erence thereto as may be necessary * * *''. The failure to do that puts the burden on this Court of going back over the pleadings, all of which have been amended in this case, and there to determine what allegations of negligence are found in these pleadings. The requirement to comply with that rule is necessary because the case is tried upon the pleadings and issues made thereby, and unless the negligence alleged in the pleadings making the issue is proven, there can be no recovery.

While we would be well warranted to refuse to consider the assignments of error we are not going to, will burden ourselves with doing the work that attorney for the plaintiff should have done, because beginning on page seven of the brief of the facts, there is a heading ''Proposition of Facts'', and there is set out separately on the three following pages what is alleged to be facts, under 17 different paragraphs which undertake to support the assigned errors and here we do find a reference to the bill of exceptions where these facts are shown, but nowhere in the entire 18 pages of the assignments of error, brief and argument of counsel is there one single reference to the allegations of negligence contained in the pleadings or issues made thereby. In other words there is not one reference to the pleadings anywhere in this assignment of error, brief and argument, not even a reference to anything contained in the declaration, neither the amendments to the declaration, nothing contained in the pleas to the declaration nor any of the amendments to the pleas of the declaration, and such does constitute a crucial question for this Court when raised by the defendant in a proper way.

We are of the opinion that the proper manner in which it should be disposed of is to dispose of assignment No. 2. The real meaning of assignment No. 2 is simply that the Court should have assumed that any negligence in and of itself on the part of the adjuster and/or attorney representing Perry in the United States District Court amounted to bad faith. That is not what is meant by bad faith as may be related to the duty that is owing to an insured when he has agreed that attorneys for the insurance company may be his attorneys and represent him in the defense of litigation growing out of the activities of the insured, such as we have here, from a collision with his wrecker and the young man's automobile as tried in the Federal Court. By saying this we do not mean to say that negligence is not an element to be proven in connection with a determination of bad faith. But the wording of this assignment of error, as stated above and quoted from the assignments by attorney for the plaintiff, is that the Court erred in not holding that "negligence on the part of the defendant" would create liability whether that negligence was such as with other circumstances and facts proven in the case would amount to bad faith.

If we understand what our own Court, and the Supreme Court has approved with respect to the question of negligence, certainly in such cases as we have now, that negligence would have to be so wanton and with such disregard of a reasonable investigation of the case, the facts incident thereto, and trial thereof that while negligence, or the corresponding lack of duty, might be considered by the jury and the Court in determining "bad faith" it must find that the company is guilty of "bad faith" and such is approved in the opinion of Southern

Fire & Casualty Co. v. Norris, 35 Tenn. App. 657, 661,
250 S. W. (2d) 785, 786, in the following statement:

"The trial court instructed the jury that no ver-
dict could be rendered solely on a showing of negli-
gence in the investigation of the claim and in negoti-
ating, attempting to negotiate or failure to negotiate
a compromise of the Davis claim though such neg-
ligence, if shown, could be considered in determining
the existence of bad faith. That term the Court
defined as conveying the 'idea of willingness to gam-
ble with the insured's money in an attempt to save
its own money' or 'as an intentional disregard of the
financial interests of the plaintiff in the hope of
escaping full liability imposed upon it by its policy'."

The Court then set forth six statements or elements to
be considered in determining whether or not a company
was acting in good faith or was acting in bad faith,
saying:

"This definition was followed in the charge by
instructions: (1) That good faith required the Com-
pany to investigate the claim to such an extent
that it would be in position to exercise an honest
judgment as to whether the claim should be settled;
(2) That the material question was not what the
actual facts were but what facts relative to the acci-
dent and injuries to Davis were known to the insurer
and its agents 'which they should have considered
in deciding whether it should or should not settle
an action brought against the insurer as the reason-
able thing to be done'; (3) That a mere mistake of
judgment would not constitute bad faith; (4) That
while the right of the insurer to control negotiations

for settlement must be subordinated to the purpose of the contract to idemnify the insured to the limit of the policy, there must be bad faith with resulting injury to the policy holder before a cause of action accrues; (5) That if the insurer dealt fairly with the insured and acted honestly and according to its best judgment it would not be liable; (6) That it owed its insured no duty to settle merely because a settlement could be made within the limits of the policy.''

That language must have been approved by both this Court, in the opinion by Judge McAmis the Presiding Judge of the entire Court, and by the Supreme Court on petition for certiorari, which was denied July 14, 1962. Having approved that language it seems to us that the Appellate Courts have laid down a fair guide for the juries to follow, and which seems to be that:

(1) Honest and fair investigation of the claim, including the circumstances of that which brought it about should be made.

(2) Upon that investigation why the facts revealed applied to the law, taking into consideration the injury inflicted and exercise reasonable judgment based upon those elements whether or not the claim should be litigated or settled

(3) Having so investigated, a mistake of judgment would not constitute bad faith.

(4) That bad faith must exist with resulting injury to the policy holder before the cause of action accrues;

(5) That if the insurer deals fairly and acts honestly in arriving at its best judgment, it would not be guilty of bad faith and therefore, not be liable, and,

(6) It owed its insured no duty to settle merely because a settlement is not made within the limits of the policy.

We think the above statement is approved in the cases of Aycock Hosiery Mills v. Maryland Casualty Co., 157 Tenn. 559, 11 S. W. (2d) 889; Southern Fire & Casualty Co. v. Norris, 35 Tenn. App. 657, 250 S. W. (2d) 785; Tennessee Farmers Mutual Ins. Co. v. Hammond, 43 Tenn. App. 62, 306 S. W. (2d) 13, and in the more recent unpublished opinion of this Court prepared for it by Judge Bejach in the case of State Farm Mutual Automobile Ins. Co. v. E. H. Fielden, the opinion being filed on Oct. 26, 1960. There being no petition for certiorari filed in that case, the learned Judge who wrote the opinion did not see fit to publish that opinion. He did, in that case, however, set aside a verdict of the jury upon the very issue of bad faith growing out of a suit for the balance of the judgment over and above the amount of insurance carried by E. H. Fielden.

Finally as to this assignment of error No. 2, we find nothing in the opinion of the Court which might be construed to mean that the negligence of an insurance company and its agents might not be so gross, or willful, or wanton as to amount to bad faith. In the end, however, whatever may be said with respect to the lack of diligence in connection with the investigation in the preparation for trial of a case of this character, it must be borne in mind that the jury, before it could render a verdict for an overage, would have to find from the proof as a whole, that "bad faith" existed in connection with its dealings with its insured.

■ If we further understand what our cases hold, there must be such state of facts proven that the jury may find therefrom or may reasonably infer therefrom that the action of the agents or employees and/or attorneys for the company, must have been such as to show that they "subordinated the rights of the insured to its own interest and that this amounted to a lack of good faith on the part of the insured's company." That exact statement is made in the case of Tennessee Farmers Mutual Insurance Co. v. Hammond on page 80 and repeated on page 81 of the majority opinion in that case, Tenn. App. Vol. 43, on page 21 of 306 S. W. (2d).

Weighing the meaning of assignment of error No. 2, as we understand it, and as applied to all of our cases in such matters by the Appellate Courts in this State as shown by the opinion, we are compelled to overrule that assignment, and say that there is nothing shown in this record amounting to negligence that could possibly be considered, standing alone, to amount to "bad faith".

■ We come now to consideration of the first assignment of error hereinabove qouted. Of course, it was the duty of the trial Court, and it now becomes our duty under this character of an assignment of error, to examine all of the proof in the case, and to determine whether from that proof there is any competent, reasonable and determinative evidence which from all of the facts and circumstances proven in support of the party against whom such contention is made, considering all reasonable inferences to be drawn therefrom, after disregarding all countervailing evidence, and if there is any competent and determinative evidence about which the

minds of reasonable men could disagree, it is proper to overrule such assignment of error.

Thus in a case where we have under consideration the assignment of error that the Court was in error in directing the verdict in favor of the defendant, we must find that there was some competent, convincing and controlling evidence from which the jury could have found bad faith to exist on the part of the insurance company in this case, before we will be permitted to overrule the action of the Court in directing a verdict for the defendant. Tennessee Farmers Mutual Ins. Co. v. Hammond, supra; Southern Fire & Casualty Co. v. Norris, supra; Spence v. Carne, 40 Tenn. App. 580, 292 S. W. (2d) 438, 442, and case after case could be cited in support of this contention, but that rule is well known by all the lawyers in Tennessee.

Now let us determine if there is any proof whatever in this record, which is competent, persuasive, controlling, and from which it could be determined that the company had acted in bad faith in handling the investigation, negotiations and trial for plaintiff in connection with the claim of the injured parties, Griffith and Mangham in the Federal Court.

Let us first look at the admissions by the plaintiff in this case:

1—He relied upon the statements made by Wesley Strevel, the driver of the wrecker when the accident here involved occurred and the two men that were with that driver.

2—He talked to Mr. Molloy, the lawyer that now represents him in this case, very soon after this accident

and had Mr. Molloy go to the General Sessions Court and represent him in the case wherein Griffith was found guilty of wreckless driving and knew Griffith was fined $25.00 growing out of the collision here involved.

3—He knew that Mr. Zinn had provided for a court reporter to appear at that hearing and to have taken and preserved the testimony given before that Court.

4—Having had Mr. Molloy to represent him in the hearing before the General Sessions Court, he knew that Mr. Zinn, the adjuster for the insurance company, knew that he had an attorney of his choice.

5—He advised with Mr. Molloy with respect to having him join in with Mr. Neely and Mr. Green in representing him in the suit in Federal Court, and was advised by Mr. Molloy that it was not necessary.

6—He .had notice from the company that the suit in Federal Court involved a greater sum than the maximum liability of the insurance contract that he had with it would provide for, and was at liberty to procure some personal independent attorney in the case, if he desired, to sit in and help in the trial.

7—He knew the condition of his wrecker and knew how the towed automobile was fastened to that wrecker so as to make it comply with the law and afford a safe method in traveling along the highway.

8—He knew that a much greater part of the debris upon the road where the collision occurred was in the traffic lane properly used by the wrecker towing the Packard.

9—He knew that the nylon cord with which employees had told him that they tied the steering wheel through

the panel of the door so that the front wheels of the automobile would remain stationary.

10—He knew that this cord was broken, and that a piece of it was left tied either to the door or to the steering wheel.

11—He knew that the hook on the safety chain was broken and that the broken part of that hook was picked up among the debris on the road at the point of the collision.

12—He knew that the highway patrolman had picked up or had taken a part of the nylon cord which had tied the steering wheel of the Packard.

13—He knew that Mr. Zinn had taken the broken hook found in the debris on the road

14—He knew what the evidence was in both the trial before the General Sessions Court and in the trial of the damage case in the Federal Court, in which Federal Court he personally testified.

15—His testimony was different in the trial of the case now being heard and the one in the Federal Court, and he so admitted on the witness stand when some of his testimony in the Federal Court was read to him in the trial of this case.

16—He knew that his son had told him that the safety chain was put on the car being towed after it was brought into the garage and before it was towed on toward Pierce's place

17—He knew that his son had told him that he had checked the nylon rope that was tied to the steering wheel

on the Packard and that the Packard was towing perfectly when it left his garage.

18—He knew that there was no eye witness to this collision except the driver of his wrecker, the two men with him at the time, and the young men in the Volkswagen.

19—He knew that the highway patrolman had testified that the skid marks made by the front end or front wheels of the Packard began on the side of the highway in the proper traffic lane of the wrecker.

20—He knew that he had been in the wrecker business, that is using wreckers to haul in automobiles for 15 years.

21—He knew that the driver and persons riding in the wrecker, with the towing car tied behind, could tell from the way the wrecker was traveling whether or not the towed car was trailing properly without even looking back at it.

22—He knew that if the towed car was swaying it could be discovered within a minute or so after something had come loose that would cause it.

23—He saw the Packard car on the following Sunday morning and he knew that the contact made by the Volkswagen with that car began at about the front on the hinged side of the back door and almost at the opening side of the front door, and that there was no indication of any contact between that Packard automobile anywhere from the rear up to this hinged side of the back door.

24—With all of that evidence he did not think that there was any liability upon his part to reimburse the injured young men. In other words, he thought it was the fault of these young men that this collision occurred.

25—He never at any time requested that the case be settled either to the adjuster or to his attorney Molloy, or to Neely and Green, who were representing him in accord with the insurance contract, in the trial in the Federal Court.

26—He knew that a copy of the letter which was written to him by the company to the effect that the suit was far in excess of his policy limits and advising that he was "free under the policy to employ your own counsel to represent you in this case", and a copy of that letter was sent to the counsel that he first had employed in the General Sessions Court and the counsel that now represents him, Mr. Molloy.

27—He knew that he talked to Mr. Molloy after he got that letter. He was asked and answered:

"Q—And he told you you didn't need counsel, isn't that right?

"A—That's right; said there wasn't anything he could do."

Both he and his son had testified in the Federal Court that the broken hook had been seen by each of them after this accident had occurred. In his testimony in this case, he said:

"I never figured we were at fault on it from the start of it."

We think it would be well now to here show the pertinent matters that were known by Mr. Camp. Mr. Camp, together with Mr. Dunlap Cannon, represented Griffith and Mangham in the damage suit in the Federal Court. Mr. Camp testified in the case now at bar. On the matters that are pertinent to the inquiry and issues in this case, the substance of Mr. Camp's testimony is that while Mr. Zinn, the adjuster for the insurance company was making his investigation and before the case was filed in the Federal Court he says he told Mr. Zinn the settlement could be made for $12,000. $6,000 in behalf of each of the plaintiffs in that Federal Court case. He also says that Mr. Zinn offered a settlement of $1,000. Mr. Camp stated that he was employed by Mr. Griffith and Mr. Mangham shortly after the accident and he wrote to the United States Fidelity & Guaranty Company in December following the accident, that he was representing these two young men. He further testified that in his investigation of the case he could not find any eye witness to the collision except the two young men in the Volkswagen and the three men in the wrecker.

On cross examination he was asked and answered:

"Q—And it is also true that from the outset you thought this was a case of doubtful liability on Mr. Perry's part?

"A—I would use that terminology, but it is a case which could have been lost or won before a jury.

"Q—It certainly wasn't an open and shut case for your side of the case?

"A—It was not. It was not a case which I would consider a clear case of liability.

"Q—Then you would consider it a doubtful case of liability, wouldn't you?

"A—If that's the way you construe what I have said, that's true. I never called it a doubtful case of liability."

Mr. Camp said he attended the trial in the General Sessions Court, and heard the testimony of the driver of the wrecker at the time of the accident. He further testified that all of the parties who were in the wrecker, testified that they checked the towed car at the top of the hill just a short distance from where the collision occurred at the bottom of the hill and that the Packard was trailing properly.

He also heard the highway patrolman testify in the General Sessions Court; heard him testify that the greater part of the debris from the wreckage was on the lane occupied by the wrecker. (Actually the patrolman testified that 90% was in the traffic lane of the wrecker). He further stated that the highway patrolman testified that there were pressure marks of the casings from the front wheels of the towed vehicle showing that they were made by the front tires of the towed Packard because they were sliding sideways and that they were right at where the debris was on the highway and that these pressure marks were two or 2½ feet away from the center line in the lane occupied by the wrecker and the towed vehicle. He further stated that he talked to Mr. Zinn about the case several times and that Mr. Zinn told him that he didn't think there was any liability on the part of Mr. Perry. The exact statement about his conversation with Mr. Zinn in connection

with the settlement of the case is first found on page 83, and this is what he said:

"The first time that I talked to Mr. Zinn was probably in January of 1959. We were both in the Sterick Building. I went to his office, after having previously notified him that I represented these boys, and I asked Mr. Zinn at that time what his thinking was in regard to possible settlement of these cases and told him that the reason I wanted to know was in order to decide whether or not to file suit, that is whether there was some chance of settling them, or whether we would have to file suit. I told him at that time that we were thinking in terms of $12,000.00 and up. I don't remember the exact figures that I mentioned, but they were substantial figures. I believe it was about twelve. It may have been fifteen thousand.

"Q—May I refresh your memory? Did you tell him that you were thinking in terms of fifteen to twenty in Mr. Griffith's case and ten to fifteen in Mr. Mangham's?

"A—I may have. I don't recall, but I was thinking in terms like that.

"Q—So that's what you were thinking of?

"A—That's right, and at that time he told me— he said, 'Well, I am thinking in terms of thirty-five hundred dollars'. And I said, 'Fine, We will go ahead and file suit'."

Mr. Camp said that Griffith was considerably more injured than Mangham but that the jury thought there

was more difference in the injury than he did. He was later asked:

"Q—Now, do you remember the date that you made this six thousand dollars offer of settlement?

"A—No, sir, I do not know the date. I do know that it was just prior to making serious efforts of getting ready to try the case. We were thinking about getting ready to try it, and Mr. Zinn called me at that time and said in effect, 'What will you take to settle these cases?' Then we talked back and forth some, I am sure, but finally I told him I would take six thousand dollars in each case.

"Q—You told him six thousand in each case?

"A—That's true, and he said, 'Well, I will give you one thousand in each case'."

He further stated that this statement made by Zinn relative to the $3500.00 was some month or six weeks before the trial and that he didn't know of the disparity between the injury of Griffith and Mangham until he took the doctor's deposition shortly before the trial. He further stated that he perhaps had the report from the Naval authorities about these injuries. He was further asked:

"Q—Did you talk to Mr. Cannon before making this six thousand-dollar offer, discuss it with him?

"A—No sir, I did not.

"Q—Did you discuss it with your clients and tell them that you were offering to take six thousand dollars in each case?

"A—I did not.

"Q—What caused you to drop from fifteen to twenty thousand in your thinking in Mr. Griffith's case and ten to fifteen in Mr. Mangham's case to six thousand dollars in each case on the telephone conversation? What caused you to do that?

"A—What caused me to do that was I thought Mr. Zinn was making a serious attempt to settle the lawsuit.

"Q—And without discussing it with anybody, you just suddenly—

"A—That was the first settlement negotiations which were ever had in that case, not only the first, but the only settlement negotiations that were ever had in the case."

He further stated in the trial of the case in the Federal Court there was no argument nor discussion about this broken hook and the safety chain not being exhibited at that trial, and that it was understood by everybody that they were not there and that there was no discussion about it. He was further asked:

"Q—There was also testimony by Mr. Wayne Perry that he had seen the hook afterwards, and by Mr. Perry, Sr., that he had had the hook after the accident?

"A—I remember Mr. Perry, Sr., so testified, and I don't deny that Wayne Perry did.

"Q—Do you remember Mr. Perry testifying that he had the safety chain, located it after the accident?

"A—I do."

He was also asked and answered:

"Q—Do you remember Mr. Perry, Sr., testifying that he saw a nylon rope which was tied on the left front door of the Packard?

"A—I remember that.

"Q—That he saw that the day after?

"A—I remember that."

He stated that four witnesses testified at that trial that they saw a piece of the broken nylon rope that was tied to the door of the automobile after this collision. He also said that the left front door of the Packard was exhibited at the trial in the Federal Court to the Court and the jury and that there was a bent place in that door. He was then asked:

"Q—And this place on there where it had been pulled in this condition, the nylon rope with a sudden strain on it would have done that?

"A—That's right.

"Q—Now, you observed the manner in which this case was prepared and tried by Mr. Green, did you not, and Mr. Neely?

"A—I did observe it insofar as an adversary observes how his adversary is preparing the case."

He was also asked if there were a number of pre-trial depositions taken by the plaintiff and the defendant. He answered in the affirmative, then he was asked:

"Q—Do you know of any pre-trial deposition for any material witness to this accident that was not taken before the trial?

"A—I can't recall any witnesses whose depositions were not taken.

"Q—So there were no surprise witnesses introduced at the trial on any material fact that you know of?

"A—That's true."

He was then asked:

"Q—I will ask you if you can think of anything else that Mr. Green did not do in preparing this case for trial that you can now tell the jury?

"A—No, I don't know of anything that Mr. Green did not do that he should have done."

He was asked a good many questions about what sort of reports he had when he made this offer of $6,000 in each case to Mr. Zinn and he finally said that he didn't know whether he had the report of Dr. Adams and Dr. Beverly Ray or not at that time, that he just couldn't remember, and he was asked again just what was correct about what he did and his answer is:

"A—I don't believe I previously testified and now so testify that at the time I made the offer I had a report from at least one doctor on every phase of the injuries to each of my clients. I had an evaluation, a report, of every injury that both of my clients received. Now, they were treated or examined by several doctors, and much of the examination of

these doctors was overlapping, much of it would not have been carried on if there had not been a lawsuit involved. I did have sufficient medical information to know the nature and extent of the injuries of my clients at the time that I made the offer.''

He said that he did not tell either of his clients about making this offer of $6,000 in each case. Then before he left the stand he made a voluntary statement in which he said:

"THE WITNESS: I would like to explain one answer that I gave while ago—that is when you asked me if I settled these cases without discussing them with my clients. I did not discuss this particular offer with my clients, but I had discussed the matter of settlement generally, and had an understanding that I had full authority to settle these cases in my discretion. I had this authority both from the clients and their parents.''

And in answer to further questions he further stated that he had never discussed with them the question of making the settlements of fifteen to twenty thousand.

Wesley Strevel testified in this case, and suffice it to say there is not one word in his entire testimony that indicates any lack of investigation with respect to the equipment or the way the accident happened. He made it very short in describing the way the accident happened. He testified for the plaintiff, that is, he was called by the plaintiff and testified as a witness for Mr. Perry. He was asked and answered:

"Q—When you say 'this way' which way do you mean?

"A—I was coming south, the Volkswagon was going north and about the time the Volkswagen got even with me he cut into the side of the Packard I was towing and he hit it so hard he knocked the Packard completely loose from the wrecker."

He was asked about the broken hook, he was also asked about the nylon cord. He testified as he did in the Federal Court exactly that the steering wheel was tied with a nylon rope, the safety chains and the hooks were all properly fastened. He told how and when they were fastened. He said he knew he was a defendant in a lawsuit in Federal Court and he heard every bit of the testimony. He testified about how the rope they had tied the Packard steering wheel with was broken, and how the safety chains were broken. There is no doubt about the hook being the same hook that Zinn had, which he said he had misplaced at the time of the trial in Federal Court and did not find until afterwards. He testified the way this Packard was hooked up to tow was the accepted way, both from the standpoint of tying the steering wheel and the safety chains and hitch in the rear. This witness told how there were backup lights on this wrecker and that he could turn them on and look through the rear window and see that the Packard was trailing properly, and he did so just before this accident happened. He also said he never had any part of the car over the center line of the road, neither the wrecker nor the car. He said that he never at any time asked the company to make any settlement in the case. He further said that both Griffith and Mangham testified in the Federal Court that they didn't know what happened. He stated he carried a policy with the

U. S. F. & G. and Mr. Zinn told him his policy would not cover the accident in any way.

Wayne Perry, the son of plaintiff in the instant case, testified at the instance of the plaintiff. He testified that Strevel called him on the telephone to come down to the garage, that is his father's garage, that he did so, and when Strevel got there towing the car it had been snowing and that he "put a safety chain on it." He was also shown the broken hook, said he saw that hook and they had it two or three days after this wreck and it was given to Mr. Zinn. He further stated that shortly before the trial in the Federal Court Mr. Zinn was out at his father's garage asking the whereabouts of the hook and was told that it was given to him a few days after the accident. He further said if the safety chain was found after the accident he didn't know about it. He did know about the rope that tied the steering wheel and said that Mr. Burrus, one of the troopers, had a piece of that rope. He explained that he, himself, put the safety chain on that Packard and hooked it to the wrecker before it left the garage going to Pierce's. After testifying that he didn't remember seeing the broken safety chain, he was asked if he didn't testify that his father had it or that it was out at the garage after the accident and he said he just didn't recall. Then questions were read to him from his testimony before the Federal Court as follows:

"Q—* * * Did you try to find it?

"A—I looked around for it that night but didn't look very much, go to much trouble.

"Q—* * * Did he ever find the safety chain?

"A—No, Mr. Perry found it.

"Q—Mr. Perry found it? Where did he find it?

"A—In the back of the wrecker.

"Q—In the back of the wrecker?

"A—It was there all of the time while Wesley was out on the highway looking."

When those questions and answers were read to him he was asked and answered:

"Q—Did you so testify under oath in Federal Court?

"A—I don't remember that.

"Q—Does that bring back to your memory the fact you did have the safety chain?

"A—It's like I told you. I haven't seen it since then.

"Q—You can't remember that but you do remember the hook?

"A—I had the hook on my desk."

By agreement the testimony given in the Federal Court by Benjamin Griffith, Cleveland Mangham, Buford Wolfe, Mrs. Bonita Vasquez, Billy Oates and Rush Burrus, highway patrolman, was read as evidence in this case from the Federal Court transcript. The substance of this witness, Griffith's testimony in Federal Court was that at the time of the accident he was driving 40 to 45 miles an hour "on my side in about the middle of the road, where I usually drive", then said that was the east side of the road and was asked and answered:

"Q—State what happened next?

"A—I met a pair of headlights, and I did not feel —I felt no swerve of the vehicle in any way. I just —it was a crash, I suppose, and I ended up on my side of the road after everything quieted down and stopped. I did not put on the brakes or anything. I never did see anything coming at me.

"Q—And then do you remember anything else after that?

"A—No, sir.

"Q—Were you knocked unconscious in the accident?

"A—Yes, sir.

"Q—But you were going straight ahead at the time?

"A—That is right.

"Q—In the east—?

"A—East lane.

"Q—In what portion of the east lane were you then, if you remember?

"A—Well, fairly in the middle, I believe."

He then described his injuries. He testified about having a collision prior to that time, on October 24, 1958, in which the same car was involved and he was injured some about the face with cuts, glass in his right eye and broken finger; and that prior wreck required a new body to be put on the Volkswagen, which he said was done at A. S. Martin & Son Body Shop. In his

first wreck this man said he was in the hospital from October 24 to December 2, '58, and had been out only 11 days when this involved collision occurred.

. On cross examination after testifying that he had been to certain places in the afternoon of the day of the wreck and that this accident occurred somewhere after 10 o'clock at night, and that he was driving from about 40 to 45 miles an hour, he was asked and answered:

"Q—And you had this accident and don't know any more about it until you woke up in the hospital out there, is that correct?

"A—That is correct.

"Q—Don't know anything about the accident at all?

"A—No."

He also stated Cleveland Mangham was with him at the time of the first accident.

The testimony of Cleveland Mangham given in the Federal Court was read to the jury, he describes how they were around Memphis in the afternoon; went to Martin's shop and while they were there; and then he was asked and answered:

"Q—What happened after you started back to Millington?

"A—Well, we left the Catholic Club, started out of town, and we weren't talking, we were just riding going back to the base. And we met this one on-coming car. And just as the headlights got past me, it seemed like it was a wall. I thought maybe we

had run into a bridge or something until they told me what it was. Just like running into a side wall. And that is all I remember.''

He said at the time to pass the headlights of the car they were meeting they were on the proper side of the highway and driving about 40 miles an hour. He then described his injuries. He stated he was in the car with Griffith when they had the other accident, and that the only injury he had in that collision was a scratch on the back of the head from flying glass.

On cross examination he said he had been with Griffith all day long the day of the accident and they were on their way back to the base. He was asked and answered:

''Q—And, as I understand it, you don't really know anything about how this accident happened at all?

''A—No, sir, I don't know exactly what happened, but I felt no swerve at all as we met the last car, and I remember sort of like a dream, it had me in the orbit, whatever it was, like a wall we ran into.''

He was then read questions and answers which counsel for the defendant in this case, as well as the defendant in the Federal Court trial, that had been given in the presence of both of his attorneys who represented him in the Federal trial on or about the 22nd of June, and these questions were read to him and the answers read as follows:

''Q—Cleveland, can you describe in your own words what happened when the accident occurred?

"A—Yes, we left Memphis and we were coming back to the base and neither of us were speaking to each other, we just weren't talking to each other, just sitting there riding, and all of a sudden I entered into the hospital, and that is all I know. I know when I came to I was in bed in the hospital.

"Q—Is that what you told me back at that time?

"A—I didn't mention anything about the—I may not have mentioned anything about the—as I describe the wall. That is the way I got the picture of it. I didn't know that I ran into a wrecker until they told me later at the hospital.

"Q—While I was talking to you, your attorneys, Mr. Camp and Mr. Cannon, were sitting right there beside you, weren't they?

"A—Yes, sir.

"Q—And I just asked the details how it happened, didn't I?

"A—Yes, sir.

"Q—Then I went on and asked you this, and asked you if I asked you this question. 'When did you first see the automobile with which you collided?

"A—'Well, at the time I didn't know it was an automobile, but I was sitting there just thinking and watching the road, and then just like that—' and you snapped your fingers,—'It happened. All of a sudden there it was, and then I didn't see it any more at all.'

"Q—Is that what you said?

"A—Yes, sir."

Beginning on page 170 the testimony of one Binford Wolfe that was given in the Federal Court was read to the jury in this case. He knew nothing about the actual collision, but he had some family relationship with the boy driving the Packard at the time the wrecker went for it. He went out to where the Packard was. The only thing material about his evidence of any competency is the fact that he says somebody connected with the wrecker after they got the Packard straightened up, tied the steering wheel with an old wire, that was picked up off the ground, to the left door, and that after the wrecker picked the Packard up and straighten it up that it was hitched and left the scene without what is called the "safety chain." He said he made a remark and the boy that was tying the wire on the steering wheel heard him, but he couldn't say that the man that tied the door was the one who drove the wrecker away. He was asked and answered:

"Q—What did you say to him, Bennie, to the fellow there tying the steering wheel?

"A—I told the man—the reason I say man, I don't know, that was tying the steering wheel, that that old wire is liable to break and tear apart to kill or hurt some one.

"Q—Did he say anything?

"A—No, sir. His remark there was just—looked at me, shrugged his shoulders, and—so what, something think like that. I couldn't say just word for word because that is all I remember, because I wasn't his boss or anything to tell him what to do or not to

do. I was just at the scene of the accident to see if I could help my sister's boys to start with, and was interested in how bad the car was hurt, because it was my sister and my brother-in-law.''

On cross examination he said he didn't see any nylon rope. He also said in his opinion that the wire he saw tied on the door and the steering wheel would have scarred or scratched up the steering wheel and the door. The final questions asked this witness were:

"Q—You don't know anything about—you don't know the boy that you are supposed to have (made) these remarks to at all, do you?

"A—No, I didn't know any one of them.''
This witness further explained that all they had out there that night for light was flashlights and some lights that they had from the automobile.

The deposition of Mrs. Bonita Vazquez, owner of the Packard, who is referred to as "Mrs. Lone Eagle'', was then read in this case. The pertinent part of her testimony is that she went out to where the Packard was turned over just before the wrecker came and saw them hitch the car to the wrecker, but she left there just before the wrecker did, and that this wrecker passed her on the road before they reached Highway 51 pulling the car in question, and was going fast enough to pass her, with no lights on the Packard, but said:

"* * * The dome light was flickering around and around and putting out a lot of light and there was a lot of light from the dome, I thought somebody could run in the back of the car, and I wondered about no lights, but I don't know whether the car

will swing out of the wrecker when it is being pulled or not, maybe it does, I don't know, but I do know the way the car was going, it was kind of rickety, like this (illustrating)—I remember.

\* \* \* \* \* \*

"Q—But you did see a red revolving globe on top of the wrecker?

"A—Yes, sir, it was huge, easily seen.

"Q—And you saw the side lights on the wrecker?

"A—Yes, sir; you could see that."

She explained that she used the word "rickety" to mean wobbly, and was asked and answered:

"Q—The front of the car was not going back and forth across the road?

"A—No, not across the road, but it was definitely moving.

\* \* \* \* \* \*

"Q—I understand that, but it is important for you to tell us as much about this as you can. I want to know what part of the car you are talking about, the part of the car that was raised up off of the road, is that the part that was moving?

"A—It was the whole thing,—it had to be the whole car.

"Q—You are talking about the motion of the car?

"A—Yes, sir.

"Q—How far did it move?

"A—I don't know.

"Q—Would it be 6 inches or 1 foot?

"A—I don't know how to tell you.

"Q—Give us your best estimate?

"A—I don't think I would be capable of judging the footage of the car, I don't think I would be qualified to tell anybody.

"Q—Was it moving a little bit?

"A—I could tell it was swaying, but I don't think I would want to say it was one foot or what, because I am not a judge of the distance, I know that. All I know is when it went around us, I said 'Look at that, how fast it is going, for goodness sake, how he is driving that car'. It was not steady."

Neither Binford Wolfe nor Mrs. Vazquez saw the wrecker after it stopped at the Perry garage where Perry's son said he put the safety chain onto the Packard and the wrecker before it left for Pierce's garage and knew nothing about the accident that is in question here.

Thomas Franklin Millington testified that after the Volkswagen had been in the first wreck hereinbefore mentioned, that the company for which he worked, A. S. Martin & Sons, had repaired the Volkswagen and put a new body on it and one week from the day that the Volkswagen was returned to owner it was back at A. S. Martin's place of business on Saturday when Millington was there. He fixed this return date as Saturday, December 13th, and in speaking of what the boys had come for, he said:

"Q—What were the boys doing there with the Volkswagen?

"A—They came in with the Volkswagen with the headlights and all of the lights going off and on and I did not have time to work on it and I told the boys that, and at twelve thirty when I left they were still working on the car."

The witness stated there was no one at the shop that day to do that kind of work and he left at noon leaving them there.

On cross examination he stated the headlights were going on and off a that time. He didn't state that he ever drove the Volkswagen, but he did say he was in a hurry to leave there and left the boys there tinkering with the car. He made no mechanical examination of the Volkswagen at that time. The witness further stated that he told Mr. Perry about the boys being in his shop and about what he observed and that he left them there tinkering with the car, the conversation taking place between three and ten days after this involved wreck had occurred. This witness denied ever having a conversation with Mr. Zinn.

In this connection, however, Mr. Zinn testified that he called this man on the telephone and talked to him, understood what he said, and in that conversation he didn't mention anything about the headlights whatever. He exhibited a memo of that conversation with Millington from his files. It should be further stated here that the two boys themselves, Griffith and Mangham, Millington says were with him at the shop that day about 12 o'clock noon, both testified that the lights were burning well when they met this wrecker. The boys in the wrecker

testified the lights were burning well when they met the Volkswagen, so regardless of whether they were going on and off at noon the day prior to the time this wreck occurred at 10-30 or 11 o'clock at night, with the parties that they were meeting and with them testifying that the lights were all working properly insofar as the headlights were concerned, the testimony of Millington amounted to nothing insofar as the facts of the accident are concerned, and the inference is that if anything was wrong with the headlights at noon they had been corrected.

Everybody that testified anything about the lights on the wrecker, after it had picked up the Packard and started back toward Highway 51 and from there to Pierce's garage, testified that danger signal top lights on the wrecker were circling and that they were brilliant, and that the view could be well seen by this circulating light.

Now we have gone into the testimony rather fully that was given by the witnesses who testified for the plaintiff in this case, because of the rule with reference to countervailing evidence and before mentioning anything further about the witnesses who testified for the defendant company, we want to refer to the rebuttal testimony of one James Leary, an attorney who was introduced apparently in an effort by the plaintiff in this case to contradict or explain what he understood to be Mr. Green's position in the case as stated soon after the trial was finished in the Federal Court. This witness was asked and answered the following question:

"Q—Mr. Leary, if you recall, will you relate when, approximately when if you can recall the date Mr. Green brought Mr. Perry to our office?

"A—I don't remember the exact date. It was on the day that the trial of this lawsuit ended in Federal Court."

He doesn't state whether or not it was the day that the motion for new trial was overruled or whether it was the date that the evidence was completed, or at the time the jury verdict was returned, but he said in the conversation that occurred in Mr. Molloy's office that Mr. Green seemed to be under the impression that the United States Fidelity & Guaranty Company would be bound up to $20,000 for the personal injuries and therefore, Mr. Leary thought that Mr. Green misunderstood the provisions of the policy. He then explained, so he says himself, that it would not cover an injury to one person in excess of $10,000. Mr. Green had been asked on almost the very last question that was asked him on cross examination, if it wasn't a fact that he thought the policy would protect Mr. Perry up to $20,000. Mr. Green had denied that saying: "No, that is not a fact." There was also exhibited by Mr. Green a letter written by Mr. Molloy to Mr. Jim Bland, who testified in this case, and who was the managing agent or claims agent of the insurance company at the time this accident occurred, and in Mr. Molloy's letter which was written after this trial in the Federal Court, and on July 17, 1939, the record shows this letter as follows:

"RE: 33AL-15173, Perry's Garage, and 33AL-15174, Perry's Garage, Our File 6267. I guess that means your office file. Dear Jim: This will con-

firm that I saw no basis before trial to write a letter demanding that you settle the case within the policy limits. I understood that the demands were twenty thousand dollars in each case. Since trial Mr. Cannon wrote me a letter advising me that he had offered to settle the case for six thousand dollars each. Mr. Perry is naturally upset by the verdict and feels your company losing the wrecker hook which he had given to one of your adjustors had a lot to do with the verdict. *I will reiterate, however, that I feel the verdict was a gross miscarriage of justice. I have reviewed the case thoroughly with both Mr. Neely and Mr. Green and you were present at one of the conferences, and I do not feel there was any evidence to support the verdict. I am sure you agree with this and both Mr. Neely and Mr. Green have advised me it is their professional opinion that this case should not have been submitted to a jury. I know Judge Boyd is extremely reluctant to grant a new trial, however, in view of the lack of evidence to sustain any theory on which the plaintiffs could recover, I am hopeful that a new trial will be granted. I certainly appreciate your offering to allow me to attempt to dispose of the cases within your policy limits. I have contacted Dunlap Cannon and he does not appear to be interested. Very truly yours,* MOLLOY and LEARY, (signed) by Sam.'' (Emphasis added)

Some reference is made in this record to the fact that an engineer or an architect had made a drawing, after going to visit the scene where this involved accident occurred, of the highway, which he had drawn to scale and that he had also gotten the dimensions of a Packard

automobile such as was being towed behind the wrecker, and had drawn its dimensions to scale. He had also drawn the dimensions of the Volkswagen to scale, and in an effort to analyze what was said by the witnesses in favor of the plaintiffs in that Federal Court case, he had placed on his highway drawing these particular automobiles in the position which some of the witnesses said that they were, as that architect understood it, after collision. There has also been some pictures made of this Volkswagen rounding a curve or in making a turn on some highway in Arkansas, and that at least an effort was made to offer these moving pictures at that hearing in the Federal Court, all of which took place in the presence of the jury.

In this record motion was made at the close of plaintiff's proof for a directed verdict, and the negligence charged in the declaration was taken up item by item in that argument, and the letter above quoted had been introduced at that trial. It is true that the learned Trial Judge overruled the motion at that time and intimated that he would consider the motion renewed at the end of all the proof, and directed the defendant to proceed with the proof.

█ Now then when we come to examine everything in this record that the Court said upon which he based his opinion, of course, we examine as carefully the testimony of the defendant as we do of the plaintiff. We think it is incumbent upon us to do that in the case of this character for the reason that if from an examination of all the proof, or after a trial Judge has heard all of the proof in a case, then based upon all the proof, if there is no substantial and convincing proof upon which

the minds of reasonable men might disagree, it becomes a matter of law for decision by the Court.

■ It is our opinion that claim agents, adjusters and attorneys for the defendants in cases of the character here involved owe a moral duty and an ethical duty to act fairly toward the defendant and the company when an insured is involved in a damage suit for which the company is carrying a maximum liability. We then ask ourselves the question, "In what respect did the defendant company, acting through its claim agents, adjusters and attorneys fail to satisfy the moral and ethical duties owing Perry in the case in U. S. District Court?" We fail to find in this record determinative evidence that supports, or from which reasonable inference may be drawn that these claim agents, adjusters and attorneys, or either of them have failed to satisfy his moral and/or ethical obligation.

In this case, Mr. Bland, the head agent we will say, for the U. S. F. & G. in the Memphis area, Mr. Zinn, the top claim agent who made his report to Mr. Bland and who is an adjuster as well as Mr. Bland, each having shown a wide variety of experience in the fields in which they operate, gave their testimony. Testimony was also given by Captain Neely and by Mr. Green, his associate in this lawsuit, who represented Perry and the company in the lawsuit in the Federal Court. Furthermore, the record is very clear that Mr. Molloy was interested in this particular matter, Mr. Perry having been a regular client of his, from the very beginning. We have shown that he appeared in the General Sessions Court in behalf of Perry in the trial of Griffith. We have already shown that Mr. Zinn appeared at that time and

that the company furnished a court reporter and that they took and transcribed that evidence that was given. So that evidence was available to all the parties in the case, Mr. Camp appearing for Griffith, including the company, its claim agents, adjusters and its attorneys. This record further shows that after that suit in the Federal Court was brought that the attorneys made careful investigation, and that the discovery depositions were taken from everybody that was supposed to know anything about how this wreck had occurred. It is also in the record that while they did not know but shortly before the trial that this man Wolfe would be a witness and would give testimony with respect to this wire being tied around the steering wheel of the Packard and to the brace of the door; that they went to the junkyard where this Packard car was located and bought that steering wheel and the left door, brought it back, and all of that was exhibited in the lawsuit.

Now from the testimony of Mr. Zinn and from the testimony of Mr. Bland, from the testimony of Mr. Neely and the testimony of Mr. Green, there has never come a record to this Court that shows that there was a more careful investigation from all the facts of the case and the law applicable to it. However, it was a factual case from the very beginning and all the parties agreed, as was testified to by Mr. Harry Camp, Perry, Bland, Zinn, Green and Neely that it was a case of no liability and that should be tried. From the facts that are stated by the men who were driving Mr. Perry's wrecker to the effect that nothing was wrong with the lights of either car as they approached each other on Highway 51 after stopping at Mr. Perry's garage and were on their way to Pierce's garage, delivering it in accord with the in-

structions of the owner; the evidence that Mr. Wolfe gave with respect to this wire being tied on that steering wheel and around that handle or brace in the door, which is an upright metal brace-like panel division and divides the ventilation section of the door from the main part of the door glass, even after it had been to the junkyard, showed no signs of any wire being tied around it. But even had it so been tied with a wire, the proof is without question that it was tied with a nylon rope, and the fact that Mr. Burrus, the highway patrolman, who had gotten that nylon rope and had been changed to another territory and had destroyed what he had in his locker along with the nylon rope; the fact that Mr. Zinn had misplaced the broken hook that was picked up in the debris where the collision occurred, seems to be the two things considered most as evidence of negligence upon which they asked the Court to let this case go to the jury.

That part of the record that was introduced in the trial in the Federal Court, that part that was introduced at the hearing before the General Sessions Court in which the driver of the Volkswagen was fined for reckless driving; Mr. Perry had absolute opportunity to have had his personal attorney, Mr. Molloy present always, and, the facts of the case seem to be that Mr. Molloy did give his close attention to this case from the very time that it originated in the General Sessions Court until after it had ended in the Federal Court, and there examined the record before he wrote the letter hereinabove copied.

If there has been any case in this Court in which the defendant in such a damage suit, such as Mr. Perry was in the Federal Court case, had an opportunity to have his personal attorney present, and had an opportunity

not only from the standpoint of a personal right, but by invitation, and not only by a form letter which is said to be a sort of type of letter written to every one of the persons that carry insurance with a damage suit like this occurs, there was conversation after conversation between counsel for Mr. Perry and counsel for the insurance company regarding this whole transaction, and with Mr. Molloy writing that he has reviewed the record and can find nothing in it which would convince him the case should have gone to the jury, and he intimates that in his opinion it was a gross miscarriage of justice by the jury in the Federal Court.

After carefully reading the entire record, we are unable to reach a conclusion that there is any competent, convincing and substantial proof that justifies this Court in reaching a conclusion different from that of the learned trial Judge.

It is to be lamented the jury found the verdict in the Federal Court in excess of the liability of the company. It is a matter of common knowledge that the company would write any amount of liability that a carrier of such insurance would desire. The fact that there is a verdict in excess of the liability of the insurance carrier is not any evidence of bad faith on the part of the representatives of the insurance company or the attorneys for the defendant in such action as was had in the Federal Court.

The lost hook, the missing piece of nylon rope, the fact that defendant made no further contact as shown by the record with Tom Millington, the fact that there was a somewhat misunderstood $12,000 demand by attorney for Griffith and Mangham, who did not even inform

his clients of such action; the fact that attorney for Perry was of the opinion that the Federal Judge erred in directing a verdict but took no appeal, whatever statement was made by the juror after that trial was over; the fact that an affidavit was filed with respect to the hook in the motion for new trial; the fact that no effort was made to contact Mrs. Simpson, a witness who knew nothing about the facts of the collision; the fact that no discussion was had with the highway patrolman who directed traffic only, and did not investigate the physical facts at the time of the accident; the fact that suggestion was made after the trial of the Federal Court that Mr. Perry sign a release after payment of the $10,000 by the insurance company; the fact that the adjuster did not attempt to contact Benjamin Griffith while he was in the hospital, particularly after he had employed an attorney; the fact that attorney for the defendant saw that there was some evidence in the Federal Court case to support a verdict of the jury while it was being tried; the fact that the adjuster said he did not expect a verdict in excess of $3500.00, or words to that effect, nor that the company furnished the counsel in the traffic court to prosecute Benjamin Griffith, taken singly or all together, upon the proof in this record constitute no more than a speculative possibility that if these things had been done there might not have been so large a judgment in the Federal Court.

 The finding of bad faith has to be from the circumstances and the proof, with inferences to be drawn therefrom, as a fact to arrive at the conclusion of bad faith, and it can not be arrived at by speculation, imagination and afterthoughts of immaterial matter relating to a lawsuit such as had its basis in the fact of the colli-

sion between the automobile being towed and the Volkswagen in which Griffith rode.

There is, as we see it, no way to find the defendant in this case guilty of bad faith, when they have the advice and counsel of claim agents, adjusters and eminent lawyers, based upon facts revealed by careful investigation, careful examination of witnesses under the right of discovery of evidence, and have reached an opinion that there is no liability on the part of the carrier of insurance, such as was Mr. Perry in this case, unless we are just simply going to say that whenever the judgment in such case exceeds the amount of the maximum liability carried, the insurance carrier will be liable for it. If we reach that state in our cases, then the insurance companies need not place any amount whatever as a maximum liability in their contracts.

The assignments of error are overruled, the judgment of the lower court in directing a verdict for the defendant is affirmed, at the cost of the complainant and the sureties on his cost bond in this case. Let judgment be entered accordingly.

Carney and Bejach, JJ., concur.